AO 91 (Rev. 11/11) Criminal Complaint

# UNITED STATES DISTRICT COURT

for the

Middle District of Florida

| | |
|---|---|
| United States of America ) | |
| v. ) | Case No. 8:20-mj-~~1339~~ 1340 AEP |
| ) | |
| Jack Bradley Rice ) | |
| ) | |
| ) | |
| ) | |

*Defendant(s)*

## CRIMINAL COMPLAINT

I, the complainant in this case, state that the following is true to the best of my knowledge and belief.

On or about the date(s) of  March 28, 2020  in the county of  Hillsborough  in the

Middle  District of  Florida  , the defendant(s) violated:

| Code Section | Offense Description |
|---|---|
| 21 U.S.C. §§ 841(a)(1), and 846 <br> 18 U.S.C. § 922(g)(1) | Possession with intent to distribute a mixture and substance containing a detectable amount of fentanyl, cocaine and methamphetamine, and possession of a firearm by a convicted felon. |

This criminal complaint is based on these facts:

Please see affidavit.

☐ Continued on the attached sheet.

*Complainant's signature*

Adam W. Phelps, TFO with DEA
*Printed name and title*

Sworn to before me over the telephone and signed by me pursuant to Fed. R. Crim. P. 4.1 and 4(d).

Date:  3/30/20

*Judge's signature*

City and state:  Tampa, FL

Anthony Porcelli, United States Magistrate Judge
*Printed name and title*

## AFFIDAVIT IN SUPPORT OF AN
## APPLICATION FOR A SEARCH WARRANT

Adam W. Phelps, a Task Force Officer with the United States Department of

Justice, Drug Enforcement Administration (DEA), being duly sworn, deposes and

states:

### Introduction and Agent Background

1.      I am a Task Force Officer with the DEA and therefore am a "federal

law enforcement officer" within the meaning of Federal Rule of Criminal Procedure

41(a)(2)(C), with authority to enforce federal criminal law and to seek search

warrants.  I have been assigned to the DEA Tampa District Office as a Task Force

Officer since August of 2015.  I have testified in judicial proceedings for the violation

of controlled substance laws, received specialized training in illegal drug smuggling

and distribution investigations, and have participated in illegal drug investigations.

2.      In connection with my official duties, I investigate criminal violations

of federal laws, including but not limited to, 21 U.S.C. §§ 841, 843, 846 and 848

(drug trafficking offenses), 21 U.S.C. §§ 960 and 963 (drug importation and

exportation offenses), 18 U.S.C. §§ 1956 and 1957 (money laundering offenses), and

18 U.S.C. §§ 922 and 924 (firearms violations).  I have received specialized training

in the enforcement of laws regarding controlled substances, as found in Title 21 of

the United States Code.  I have completed DEA basic and advanced agent training at

the DEA Academy, which included training in advanced techniques such as

undercover operations and Title III wiretaps.  I have testified in judicial proceedings

and prosecutions for the violation of controlled substance laws. I have received specialized training in illegal drug smuggling and distribution investigations, and have participated in numerous illegal drug investigations.

3.     This affidavit is being submitted in support of a Criminal Complaint charging Jack Bradley Rice with distribution and possession with intent to distribute controlled substances, specifically fentanyl, cocaine, and/or methamphetamine, in violation of 21 U.S.C. §§ 841(a)(1), and 846, and possession of a firearm by a convicted felon, in violation of 18 U.S.C. § 922(g)(1).

4.     The statements in this affidavit come from my personal observations, my training and experience, and information obtained from other agents and witnesses during my investigation of this matter. The word "agent" is used in this affidavit for all Federal, State and Local law enforcement officers. Because this affidavit is being submitted for the limited purpose of securing a search warrant, I have not included each and every fact known to me concerning this investigation. I have set forth only the facts necessary to establish probable cause to search the cellphone and seize items that constitute contraband, fruits, evidence, and/or instrumentalities of violations of 21 U.S.C. §§ 841(a)(1), and 846.

### **Background of Investigation**

5.     On or about January 6, 2020, DEA agents learned through the use of a Pinellas County Sheriff's Office Confidential Source ("CS1") that Jack Bradley RICE III ("RICE") is a distributor of multi-ounce quantities of crystal methamphetamine

2

and multi-gram quantities of fentanyl / heroin.[1] CS1 has seen up to four gallon size Ziploc style bags filled with crystal methamphetamine and one to two gallon size Ziploc style bags half filled with heroin and fentanyl. RICE only sells ounce quantities of crystal methamphetamine and multi-gram quantities of the heroin and fentanyl. At the time of this debriefing, CS1 stated RICE had just recently moved into a house located at 7145 51st Avenue North, St. Petersburg, Florida (the "Residence.") CS1 advised RICE is living with his girlfriend, "Heather."

6.    Det. Phelps showed CS1 a Florida Department of Highway Safety and Motor Vehicles (FL DHSMV) photograph of Heather Danae Joseph ("JOSEPH") dated October 2018. CS1 positively identified "Heather" as JOSEPH. CS1 stated RICE is driving a silver BMW 5 series but the CI did not know the tag number. CS1 has known RICE for approximately one year and has purchased heroin, fentanyl and crystal methamphetamine from RICE. CS1 provided a contact number for RICE as 727-520-55##. CS1 has allowed RICE to utilize the CS's residence to conduct numerous drug transactions. RICE will often arrive at the residence carrying a back pack and a suitcase. The back pack usually contains multiple paint cans that are filled with crystal methamphetamine, heroin and fentanyl. According to CS1, the suitcase contains multiple firearms to include rifles, "sawed-off" shotguns, and pistols.

7.    On or about January 6, 2020, agents drove by the Residence and observed a gray 2011 BMW 5-Series vehicle parked at the Residence.

---

[1] CS1 has an active non-extraditable warrant out of Michigan for failure to appear, has prior convictions for retail fraud (misdemeanor), escape lawful custody, possession of alprazolam, possession of cocaine, resist officer without violence, and possession of synthetic cannabinoids.

3

8.      On or about January 7, 2020, agents attempted to conduct a trash search at the Residence. While driving by, agents again observed the BMW. This time, they were able to determine the license plate for the BMW as Florida temporary tag of CPU6191.

9.      Florida DHSMV records indicated that the 2011 BMW was registered to Marquesha ISAAC. On the same day, agents observed RICE standing near the vehicle. Because RICE was outside, a trash search was not conducted.

10.     According to Florida DHSMV records, temporary tag CPU6191 was updated on January 21, 2020, to Florida license plate D6EIL. In addition to the updated license plate, the documents for the vehicle showed the "lien holder" to be Jack RICE, with his address listed as the Residence.

11.     Agents obtained RICE's number from the CI, and ran the number through the Pinellas County Jail ("PCJ") inmate phone system. Agents observed multiple calls made by different inmates from the jail to RICE's number. The majority of the accepted calls were made from Ben GORDON. Agents checked GORDON's call logs and observed he also made calls to Marquesha ISAAC, the registered owner of the 2011 BMW. RICE also received calls from an inmate identified as Jessica CHRISTLE. Some of the recorded calls are discussed below.

12.     On or about July 1, 2019, Jessica CHRISTLE placed a call from PCJ to RICE at his number. CHRISTLE was in jail for possession with intent to sell a controlled substance. The substance was later lab tested and found to be a mixture of fluoroisobutyryl fentanyl (fentanyl derivative) and heroin. During this conversation

4

CHRISTLE stated "hi, Jack can you please get me out." RICE did not dispute his identity on the call and the two continue to discuss CHRISTLE's charges and how she was caught. At one point, RICE asked CHRISTLE where she got her substance from, and, in what I determined to be a sarcastic tone, CHRISTLE responded "oh I don't know?." RICE then laughs at CHRISTLE's response and CHRSITLE tells him that "it is not funny." At the end of the conversation RICE agrees to bond CHRISTLE out.

13.     Agents listened to numerous recorded calls made by GORDON to RICE from the Pinellas County Jail. The nature of the calls ranged from personal topics to organizational discussions of drug profits, practices, and new sources of supply. On or about May 7, 2019, during a recorded jail call from GORDON to RICE, GORDON used terms such as "mashed potatoes...thick...watered down" to ask about the quality of the narcotics. RICE understood the code and said he couldn't tell if it was "watered down." Based on my training and experience, the above mentioned terms are code words for the narcotics because both parties understand the calls are recorded and subject to monitoring by agents. I know that drug dealers use cutting agents to increase the amount of narcotics which increases their profit. However, when too much cutting agent is used, the potency of the narcotics is weakened which would be synonymous with the term "watered down."

14.     On or about October 5, 2019, in another recorded jail call RICE discussed a new source of supply with GORDON. Specifically, RICE described the source as a "chico" and that the source is in Atlanta. GORDON asked if it was for

5

"popsicle" and RICE told him "yes." Based on my training and experience, the term "chico" refers to a Hispanic subject and the term "popsicle" was code for crystal methamphetamine. Crystal methamphetamine is often referred to as "ice cream," "ice," or any other descriptive term referring to ice cream such as "popsicle."

15.     On or about November 17, 2019, during a recorded jail call between GORDON and RICE, the two discuss saving and laundering their drug proceeds that RICE is making on behalf of both of them. RICE stated "all that money that I had you know put up with, for ya, uh with ya," when talking about their proceeds. RICE and GORDON then agree to launder their proceeds through the Florida Department of Corrections commissary account for GORDON. Specifically, RICE tells GORDON:

>     a.  "I might start sending, cause when you go to Graceville your
>         account can just stack..and I might start sending like money to you
>         and then you can spend whatever you need out of it but then save
>         the rest for me (unintelligible) that way its put up and that way when
>         you get out you got that extra check you can pay half after half  you
>         see what I am saying..like and we we will go about it like that like
>         say if I put in 200 then 200... cause at Graceville bro your shit can
>         rack up I'm talking about they don't say shit..you can have thirty
>         bands in that bitch."

16.     Based on my training and experience, the above conversation means that RICE wants to use GORDON's inmate money account to save their joint drug proceeds, rather than having it in cash with RICE. The terms "thirty bands", means $30,000 US Currency. Based on my training and experience, it is common for drug dealers to use different ways to hide their proceeds because depositing large amounts

of US Currency in bank accounts without a known income causes suspicion at the banking entity.

17.     On February 12, 2020, a Federal Magistrate Judge in the Middle District of Florida authorized law enforcement to utilize electronic GPS surveillance of RICE's phone. Through surveillance and spot checks at the Residence, law enforcement are aware that on several occasions, GPS location showed RICE's phone was at the Residence at the same time that the 2011 BMW was parked there.

18.     On or about February 21, 2020, agents received additional information regarding RICE through the use of a Pinellas County Sheriff's Office Confidential Source ("CS2").[2] CS2 stated that CS2 met RICE a few months prior to the date of the debriefing. CS2 identified the criminal associate that introduced him/her to RICE as James HINGLEY. CS2 stated sometime in January 2020, CS2 and HINGLEY contacted RICE for the purpose of purchasing crystal methamphetamine. RICE instructed CS2 and HINGLEY to go to his Residence and pick up a bag and bring it to RICE's location. CS2 stated that CS2 and HINGLEY went to the Residence, met with JOSEPH, and picked up the bag. CS2 stated HINGLEY and CS2 met with RICE and followed him to the Rodeway Inn located at 16405 US Highway 19 North, Clearwater, Florida 33764. CS2 stated once they were in the hotel room, RICE removed multiple ounces of crystal methamphetamine, fentanyl and heroin from the bag. CS2 stated HINGLEY and

[2] CS2 has prior convictions for petit theft with two prior convictions (felony), possession of methamphetamine with intent to sell, manufacturing of methamphetamine, and possession of methamphetamine.

7

CS2 purchased approximately two ounces of crystal methamphetamine from RICE

for $500. CS2 stated HINGLEY and RICE are close friends and HINGLEY

purchases between six to eight ounces of crystal methamphetamine from RICE at a

time. CS2 stated RICE informed CS2 that he presses his own fentanyl, heroin and

adds Gabapentin to the mixture.

## Undercover Purchases from Cooperating Defendant Two

19.     On or about February 27, 2020, through the use of a Clearwater Police

Department Confidential Source ("CS3"), agents learned that an individual, who

would later become a cooperating defendant, ("CD2") was a multi-ounce distributor

of crystal methamphetamine. CS3 provided a contact number for CD2. Agents

conducted phone toll analysis of RICE's number from dates November 8, 2019

through March 16, 2020 and observed that CD2 and RICE have had 154 total

communications.

20.     On or about March 4, 2020, through the use of CS3, agents were able to

arrange for a controlled purchase of four ounces of crystal methamphetamine from

CD2. During the purchase, which occurred on the night of March 4, 2020, CS3 was

accompanied by an undercover agent ("UC"). CS3 was equipped with an audio and

video-recorder, transmitting equipment, and $1,800 of department funds, which CS3

and CD2 had agreed to as the price for the crystal methamphetamine. CS3 was

searched for contraband, which none was found. The UC then drove CS3 to 7402

49th Street North, Pinellas Park, FL. 33781. As they approached, CD2 sent a

message to CS3 that advised, he (CD2) was in a red Volkswagen and he was parked

in front of "Sherwin Williams." Surveillance units identified the vehicle and observed the license plate of the vehicle. The UC and CS3 arrived a short time later, and parked their vehicle near CD2's. The CS exited the UC vehicle and entered CD2's. A few minutes later, CS3 exited CD2's vehicle, and returned to the UC vehicle. CS3 informed the UC that CD2 was accompanied by another individual, who would later become cooperating defendant three. ("CD3"). CD2 and CD3 told CS3 that they would return in ten minutes with the crystal methamphetamine. CD2's vehicle backed out of its parking space and exited the parking lot.

21.     Surveillance units followed CD2's vehicle as it exited and headed west on Park Boulevard. Surveillance units maintained constant visual surveillance on CD2's vehicle as it traveled from the transaction location directly to the Residence. Agents established surveillance of RICE's residence prior to CD2's vehicle arriving. Agents observed the vehicle stop at RICE's Residence and a male subject enter RICE's Residence through the front door. A few minutes later, the same subject exited the Residence. Agents observed CD2's vehicle drive away from the Residence and turn north on 72nd Street North from 51st Avenue North. Surveillance units maintained constant visual surveillance on CD2's vehicle as it traveled from the Residence back to the transaction location. CD2 did not make any stops on his way back to that location. CD2 arrived at 7402 49th Street North, and parked on the west side of the location. The passenger, CD3, exited the vehicle and walked around the business and met the UC and the CS3 at their vehicle. CD3 placed approximately six ounces of crystal methamphetamine that was packaged in two envelopes on the front

9

passenger seat of the UC vehicle. CD3 returned to CD2's vehicle and the vehicle exited the area.

22.     Upon arriving at a debrief location, the UC and CS3 explained that, back at the transaction location, CS3 got into CD2's vehicle and could plainly observe CD2 and CD3 in the vehicle. CS3 provided the department funds to CD2 who told CS3 that he would return within 10 minutes with the crystal methamphetamine. CS3 exited CD2's vehicle and waited with the UC for CD2 to return. The UC explained that he initially could not identify the occupants in CD2's vehicle. However, when CD3 dropped the crystal methamphetamine in the UC's vehicle, the UC was seated in the driver's seat and positively identified CD3 through the open front passenger window of his vehicle. Agents searched the CS again for contraband. They found none. A presumptive test of the suspected crystal methamphetamine was performed, and the substance tested positive for the presence of methamphetamines. Later that date, CD2 contacted CS3 and advised he gave the CS too much crystal methamphetamine.

23.     On or about March 10, 2020, the UC contacted CD2 for the purpose of paying the debt of the extra two ounces of crystal methamphetamine. CD2 agreed to meet the UC and agreed to sell the UC ounces of crystal methamphetamine. CD2 agreed to collect a total of $980 for the previous two ounces and for one additional ounce the UC was purchasing from CD2. On the same day, March 10, 2020, CD2 agreed to meet the UC in the parking lot of Smokey Bones located at 2693 Gulf to Bay Boulevard, Clearwater, FL. Through a series of messages, CD2 advised he was

at the location in a red Volkswagen. The UC entered the rear driver's side of the vehicle and CD2 advised the crystal methamphetamine was in an envelope on the seat next to the UC. The UC placed the $980 of department funds on the center arm rest of the vehicle and opened the envelope and observed the suspected crystal methamphetamine. After a short conversation, the UC exited the vehicle and observed CD2 secure the $980 of department funds from the center arm rest. A presumptive test of the suspected crystal methamphetamine was performed, and the substance tested positive for the presence of methamphetamines.

### Cooperating Defendant One

24.     On or about March 17, 2020, agents established surveillance on a Cooperating Defendant ("CD") at his/her place of work. Surveillance units observed the CD meet with RICE at the La Quinta Inn located at 7500 US Highway 19 North, Pinellas Park, FL 33781. While the CD was in RICE's room, agents observed CD2 and CD3 arrive at the hotel and walk to the vicinity of RICE's hotel room. Sometime later, CD2, CD3, and the CD emerged from the area of RICE's hotel room, entered their vehicles, and exited the hotel. Surveillance was maintained on the CD, while CD2 and CD3 were not followed. The CD picked up a passenger and began traveling to Pasco County. Later, Pasco County Sheriff's deputies conducted a traffic stop on the CD. A K-9 "sniff" of the exterior of the CD's vehicle was conducted and a positive alert was given. A search of the vehicle and the CD resulted in locating approximately 3.5 grams of fentanyl on the CD's person. A presumptive test of the suspected fentanyl was performed, and the substance tested positive for the

11

presence of fentanyl.

25.     Subsequent to arrest, agents read the CD his/her Miranda rights. The CD said that the CD understood his/her rights and was willing to answer questions. The CD stated the CD had purchased approximately 3.5 grams of fentanyl from RICE for $370. The CD stated RICE was residing in a hotel room and while the CD was inside, CD2 and CD3 arrived. The CD did not observe a transaction between RICE and CD2 or CD3. The CD stated he/she has purchased fentanyl from RICE in the past and usually buys 1 to 3.5 grams of fentanyl at a time. The CD gave consent for agents to view his/her phone and agents observed text messages between the CD and RICE. On March 16, 2020, the CD told Rice via text message "need a boy," which the CD explained meant wanting to purchase fentanyl. On March 17, 2020, the CD told RICE via text message "wya," which the CD stated meant he/she was asking for RICE's location.

26.     On or about March 25, 2020, the UC contacted CD2 through a series of messages. CD2 informed the UC that he wanted to make a large purchase of crystal methamphetamine and asked the UC to be a part of the purchase. The UC agreed and CD2 stated he would know more in the upcoming days. Later this date, the UC spoke with CS3 who stated James HINGLEY was leaving to go to Atlanta, Georgia to pick up a large amount of crystal methamphetamine. CS3 stated CD2 wanted to purchase a large amount of what HINGLEY brought back from the Atlanta area. Agents instructed CS3 to inform CD2 that the UC would help with the large purchase and to notify the UC when CD2 was ready to make the purchase.

12

27.     On or about March 26, 2020, agents learned through CS3 that CD2 has communicated with his source of supply and that the crystal methamphetamine will be available to purchase in the morning of March 27, 2020.

**Undercover Purchase from RICE**

28.     On or about March 27, 2020, agents established surveillance on Cooperating Defendant 2 ("CD2") and Cooperating Defendant 3 ("CD3"). Surveillance was maintained on CD2 and CD3 and a traffic stop was conducted on their vehicle. CD2 and CD3 were arrested for Florida State charges of trafficking methamphetamine. Agents learned through CD2 and CD3 that Jack RICE was in possession of an unknown amount of heroin and fentanyl.[3] CD2 and CD3 made a recorded call to RICE's phone number at 727-520-55## for the purpose of coordinating a purchase of fentanyl from RICE. RICE answered the call and instructed CD2 and CD3 to come to his location at the Days Inn, located at 5005 34th Street North, St. Petersburg, Florida.

29.     On or about March 28, 2020, agents established surveillance at the Days Inn and observed RICE's gray BMW parked on the east side of the hotel.  Law enforcement searched CD2, CD3, and their vehicle for contraband and found none. CD2 and CD3 were equipped with an audio recording device. Agents provided CD2 with $800 in official advanced funds for the controlled purchase. A second recorded call to RICE was made by CD2 and CD3. During the call, RICE advised them to

---

[3] CD2 has a previous felony drug conviction, and CD3 has an active non-extraditable warrant for misdemeanor possession of marijuana.

park near his vehicle on the east side of the hotel. CD2 and CD3 followed agents

from the predetermined location to the Days Inn. Agents were able to observe and

record video footage of RICE meeting with both CDs and leading them into room

#145. Minutes later, CD2 and CD3 exited the room, entered their vehicle and exited

the hotel parking lot. The vehicle that the two were in was followed to a

predetermined location and met with agents. The CD's provided law enforcement a

clear plastic bag containing approximately 10 grams (weight with bag) of suspected

fentanyl to agents. CD2 and CD3 stated they entered the room with RICE, who

removed the fentanyl and a scale from within his black backpack and weighed out

approximately 8 grams of fentanyl. RICE then packaged the fentanyl and provided it

to CD2, who then provided the funds to RICE. CD2 and CD3 stated RICE told

them he had not been home but wanted to go back to the Residence to pick up

another firearm. After a short conversation, both CDs exited the room. A

presumptive test of the substance was positive for the presence of fentanyl.

     30.    Later that date, March 28, 2020, agents reestablished surveillance on

the Days Inn and observed RICE's BMW parked in the same location. Surveillance

observed RICE and an unknown female exit the room. RICE brought out multiple

bags, as well as a black backpack. RICE placed the bags into the trunk of the car and

the backpack in the driver's side rear seat. RICE and the unknown female entered

RICE's BMW, and exited the hotel lot, with RICE driving the car. Because RICE

had an active outstanding warrant for his arrest for failure to pay child support, law

enforcement officers detained him in the parking lot of a nearby business.

31.     A Pinellas County Sheriff's Office K-9 arrived on scene and deployed her K-9 partner around the exterior of RICE's vehicle. The K-9 alerted to the vehicle. A search of the vehicle resulted in the seizure of two firearms, approximately 37 grams of fentanyl, 23 grams of cocaine, 21 grams crystal methamphetamine, 7 grams of cocaine base, and an undetermined amount of US currency. All substances presumptively tested positive for what they purported to be.

32.     A search of the vehicle revealed two smartphones. First, on the driver's seat, where RICE was sitting, an iPhone was found with a cracked screen. Second, a black Samsung smartphone was found inside the backpack that law enforcement observed Rice place in the car. Law enforcement called Rice's phone number at 727-520-55##, and the iPhone rang. Rice later stated the iPhone belonged to him. Cash was found on Rice's persons, and inside a safe that was inside Rice's backpack.

33.     I am aware RICE is a convicted felon, and as such, does not have the right to own or possess firearms.

34.     On March 28, 2020, subsequent to RICE's arrest, agents established surveillance at RICE's Residence. At approximately 9:00 p.m., the Honorable Amanda Sansone, United States Magistrate Judge for the Middle District of Florida, authorized a search warrant to search RICE's Residence.

35.     Inside the residence, which was empty of any other persons, law enforcement seized:

    a.  a black AR-15 rifle, with no serial number, that was equipped with a functioning "EOTech" sight, and an one hundred round drum, all

15

of which were hidden inside one of the walls of the master bedroom.
The one hundred round drum was loaded with thirty 5.56 millimeter
rounds. Law enforcement had to physically pull the wall apart in
order to recover the hidden rifle and drum;

b.  a black ballistic vest that was hanging in the master bedroom door;

c.  four fentanyl patches;

d.  approximately 1.5 grams of crystal methamphetamine on the
nightstand next to the bed;

e.  approximately 5 grams of crystal methamphetamine located in an
envelope on the floor of the living room, and

f.  a hydraulic press, often used to solidify the narcotics after it has been
mixed with a cutting agent, located in the northern most room of the
residence.

36.     Additionally, inside a black bag found in the southwest bedroom, law
enforcement recovered a black cellular phone jammer. The device was activated and
agents observed that cellular telephones within the residence had no service. Based
on my training and experience, this device is often used by distributers of narcotics in
order to disrupt the recording and transmitting of cellphones.

37.     Agents also located utility bills clipped to the refrigerator. The bills were
for the Residence, and were listed under the name Jack Rice. Inside the residence,
probation paperwork belonging to Jack Rice was also recovered.

**Conclusion**

16

38.     Based upon the information contained in this affidavit, I believe there is probable cause to believe that Jack RICE knowingly distributed and possessed with intent to distribute a mixture and substance containing a detectable amount of fentanyl, cocaine, and methamphetamine, in violation of 21 U.S.C. §§ 841(a)(1), and 846, and possession of a firearm by a convicted felon, in violation of 18 U.S.C. § 922(g)(1).

_____
Adam Phelps
Task Force Officer, DEA


Affidavit submitted by email and attested to me as true and accurate by telephone consistent with Fed.R.Crim. P. 4.1 and before me this
3̲0̲t̲h̲ day of ___March___, 2020.

_____
ANTHONY PORCELLI
United States Magistrate Judge

17